Good afternoon and welcome to the Ninth Circuit. And before we begin, Judge Biby and I would once again like to thank Judge Bennett from Maryland for sitting in the Ninth Circuit and in this case in particular again. Thank you, Judge Bumate. It's always a pleasure to be back here in the Ninth Circuit and it's not often we get a comeback where twice we have to be out of here on this case. So it's nice to be here. And let me just check, Judge Biby, are you hearing us okay? Yes, thank you very much. I can hear you just fine. Great. Mr. Perry? Thank you, Judge Bumate, and may it please the Court again. At the outset of this litigation, before there was a trial, before there were findings of fact, the District Court committed two legal errors reviewed de novo in this Court that require reversal of the judgment on our submission. First, the Court adopted a manifestly erroneous standard for judging what constitutes a derivative work. Under the law of this and every circuit, substantial incorporation of copyrighted material is a necessary element. But with the exception of 15 so-called rewrite files, which is paragraph 2 of the injunction, Oracle did not prove that any of the thousands of updates, files, or tools at issue contain any Oracle code or expression. It didn't even try. That was because the late Judge Hicks ruled many years ago that these works were derivative simply because they interact with PeopleSoft software, and that is wrong as a matter of law. Second legal error, Your Honor, Section 117A of the Copyright Act provides an affirmative defense for copies made as an essential step of utilizing a computer program, including the provision of maintenance services. This defense is tailor-made for this case. Congress provided it for this situation. The Nimmer Treatise recognizes that fact. Yet the District Court dismissed it on the pleadings, on the sole ground that Oracle licenses and rather than sells its software, a categorical rule that has been rejected by this Court and the Second Circuit under this particular statutory provision. Roberts. So, yeah, can you show me how you get there on a textual basis? It says owner of a copy of a computer program, right? Yes. So, yeah. So the textual basis is it does not say owner of the copyright. As the Nimmer Treatise explains, that would make the statute redundant because the copyright owner doesn't need permission. It says the owner of a copy of a computer program. And this is a statute that was enacted in 1986, Your Honor, in the dark ages of computers when software was delivered on diskettes or CDs or physical media. The Vault case from the Fifth Circuit explains, for example, that if a software – if a computer program copyright owner delivered a copy on a diskette to the user, the copy – the software creator may own the copyright, but the user owns the copy of the program on that diskette. Same applies here. The District Court acknowledged at E.R. So you're talking about the physical diskette, correct, not the program itself or anything? No. No, Your Honor. It is the copy of the computer program. That's the language used. It is not an infringement for the owner of a copy of a computer program. And so it's the copy of the program. It's already been copied. And that copy is owned by the user. Whether it's licensed or sold, as the Second Circuit has explained in tremendous detail, isn't the dispositive test. The question is whether the user has the incidence of ownership over that particular copy. Right. And then user – incidence of ownership is like you can manipulate it, you can change it, and you could give it to whoever you want. But under the license program, you can't do any of that. So if I could take those in three steps, Mr. Umeteh, because the licenses actually do permit manipulation and use. They permit archival uses. They permit maintenance. They permit the creation of copies for internal business purposes. The restriction on transfer, that's true. It's a single-user license, but it expressly authorizes third-party support. And this Court has held that twice, that that's authorized. So that doesn't defeat ownership. I have a mea culpa, Judge Blumenthal, in preparing for this. There is a case that we didn't cite in our brief. I would like to provide it to the Court. Universal Instruments v. Microsystems Engineering, 924 Fed 3rd 32, which is the Second Circuit from 2019, expressly applied both Verner and Krauss, right, this Court's leading opinion and the Second Circuit's leading opinion, in the context of a license that included a licensee's internal use restriction, the restriction that Oracle relies on to say that this was a license rather than a sale. And the Second Circuit held in that case that the owner of the copy was entitled to present the 117A defense, in fact, prevailed on the 117A defense, even though it had precisely the internal use restriction that the Court has mentioned and that Oracle places sole reliance on in this case. And who was then a licensee and not an owner at First Bosch? Your Honor, they are a licensee of the copyright. They are an owner of the copy. And that's a fundamental distinction that the Court has drawn. The Second Circuit made it clear in Krauss. The Federal Circuit made it clear in DSC. This Court recognized in UMG that the copyright and the copies are split for purposes of 117A because Congress recognized that the user has to be able to maintain its own software, exactly what's happening in this case. Now, to be clear, the courts have also said that this is a factual question, right? Whether the incidents of ownership are met depends on the facts and circumstances of every case. This defense was struck, stricken, in this case on Oracle's motion on the pleadings, on a Rule 12 motion, so that we never had the factual development. It was very early in the litigation. And it was stricken on a bare argument by Oracle that customers only license rather than buy Oracle's software. The question of whether the users are an owner of the copy was never presented to the District Court and never decided by the District Court. The District Court cited Verner, but neither the incidents of ownership under the Krauss test or even the three-factor test under Verner that Oracle recites in this Court, that was not presented to the District Court. I mean, the case was, but the analysis that Oracle presents was not. And this matters, Your Honor, because in Adobe Systems, this Court held in so many words that a license for software may create a sale for purposes of Section 117a. And Oracle, at page 30 of its red brief, disclaims the categorical rule that the District Court relied on. In other words, the District Court was asked to and did apply a categorical rule in an area where this Court and the Second Circuit and the Federal Circuit and the Fifth Circuit have said it's a factual question. Even Verner, probably the high-water mark of licensing rather than sales, was a summary judgment case decided on a factual record, not a pleadings case decided on allegations. And in this case, we, Rimini, went far beyond the allegations once the case was transferred from Judge Hicks to Judge Due. In our joint pretrial submission, we put in a lengthy proffer of all of the evidence that would show the incidence of ownership under the Kraus test. The District Court Can I ask that that Second Circuit case that you just cited, does that involve a licensure program as well? Yes, Your Honor. It is very close to this case. It involves a copyright producer, a software creator that licenses copies to users with the right to use and maintain with an licensee paid over a million dollars, also true here, because the software was customized to the licensee, also true here, because it was provided to the licensee for use on its own systems, also true here, and because it was a perpetual license for the licensee's own internal use, also true here. The Second Circuit held that it was a — that the user was an owner of a copy under 117a, and that user prevailed. Mr. Kummer, what was the nature of that software? So that was — it was source code enterprise software, not the same kind of enterprise software here, but it was giant — you know, big machine — you know, mainframe software, Your Honor, not consumer software, but enterprise software for a corporation that needed to be modified for a corporation's use, including by modifying the source code, which has, of course, been an issue in this case. You know, it's quite close here. And Kraus itself, of course — Counsel, you're arguing that the district court was inappropriate in deciding this on a 12b-6. Are you asking us to simply reverse the district court on its ultimate conclusion on the basis of this record? That would suggest that the record is complete. Or are you asking us to send this back to the district court for further findings? And if so, what further findings would you be able to offer? Yes, Your Honor. On the 117a defense — because my answer is different for some of the other arguments we're making, so I need to be clear on that — we believe this is a reverse and or vacate and remand argument, Your Honor. The district court's error was throwing it out on the pleadings so that neither party had an opportunity to litigate the applicability of the defense. The defense actually has two components. One is whether the user is an owner of the copy, and then the second is whether the copies are an essential step. Both would have to be satisfied. It is an affirmative defense. We recognize that, but it was not in the case. What would be proven, Judge Bybee? The incidence of ownership. The four-factor test in Kraus, the three-factor test in Verner, those have to be, you know, intermingled, if you will, combined, as the Court did in UMG, recognized. And as I said, in our joint pretrial submission, we put in detailed evidence from the depositions and other — and documents in the record showing how we, Rumini Street, would meet our burden of proof on every one of those incidence of ownership test. You know, Oracle, it's a little surprising there. They don't — they don't dispute that we could prove the incidence of ownership. In fact, in their brief, they say that these are immaterial considerations. That's what they call the four factors from — from Kraus. Immaterial considerations. We think they are the standard, actually, the law that the Court's required to follow and that the Court did follow in UMG. So we have, you know, a fundamental difference there, and we would need to have a trial on that. This should have been in the case all along. This was injected as a defense. This was the second litigation, to be clear, right? We had the first round of litigation that clarified the party's rights and obligations. Rumini began this second litigation to get a declaration that its new processes do not infringe. Oracle counterclaimed. We asserted the 117A defense for the first time in this second case. It should have been in the case all along. It should have made all the difference. Ten years of litigation, hundreds of millions of dollars in legal fees would have been avoided had the District Court applied the statute that Congress wrote for this particular circumstance. I mean, the Nimmer Treatise, which has a very long section on 117A, discusses this case for two full pages and basically says, I don't understand why 117A was never in this case, because it should have been litigated here. And the reason is it was thrown out too early at Oracle's request over our objection. We tried to put it back in before trial. We put it in our pretrial submission, and Judge Bumate picks his ruling. She ruled that it was law of the case. And, therefore, we are stuck without having the defense Congress gives us. Roberts. I'm looking at universal instruments, and it does seem pretty close, so I want to take a closer look at that. But can you remind me how you get there textually? Because it says owner, and so you're saying we should just read that as not owner in the plain-text word. It's owner based off the incidences of ownership. So the analysis or the doctrinal basis is this, Judge Bumate. The 117A came out of a CONTU report, C-O-N-T-U report, that was presented to Congress in 1985. The CONTU report recommended that this defense be available to all rightful possessors of the software. And clearly we would meet that standard. Right. And then that was struck in. Well, and it was changed, and the legislative history doesn't tell us why, to owner of a copy, although 117C still refers to when the rightful possession ends, so that clearly rightful possession is a component, even if it's not the only test. At least this was the Second Circuit's reasoning in Crouse. And so what Crouse said, you know, Crouse has the probably most doctrinal analysis of the language, says title can't be controlling, because owner of a copy means something different than title. We don't want variability of state law. And the incidents of ownership matter for purposes here, because the real question that Congress was trying to get at is, does a user have the right to tinker, adjust, modify, adapt the software that they've been given? And so that's how they – and we think the Crouse case plus the universal case is intractable. Right. Unless my colleagues have questions on this, I've kind of – Go to the next one. Yeah. I had one question on the database issue. The district court found there's infringement for the 18 GAP databases. Would those – would those fall in under the Oracle-Romini 1 injunction by Judge Hicks? They were migration files that were – so the first ruling was that we couldn't have the systems on the Romini systems. Right. So Romini moved them or migrated them to client systems. Copies were made during the migration. So these 18 database files are within the 95 migrated set. So they would have fallen in under the Hicks ruling. It just happened later? Is that my understanding? Not the injunction, Your Honor. The ruling – the local hosting ruling that Romini then complied with by moving the environments onto the client systems. As to database in particular, the court here basically relied on Judge Hicks's contempt ruling to say there was a facilities restriction in the database license. This court then reversed that ruling in the last appeal, and we think the same logic just applies here, sort of lock, stock and barrel. Right. That's why I have that question, because does – would these 18 fit under the Hicks ruling, which I think, you know, there was that waiver argument, which just seems to be law of the case. And then there's the ruling in the contempt, which we somewhat disagree with it. But – and my understanding is that it should fall under the law of the case, the Hicks ruling. I just – if there's a reason why it shouldn't. I would think it's the other way, Your Honor, if you look at – respectfully at ER-168, which is the district court's ruling on these particular database files. The court said Judge Hicks reiterated this prohibition when he found Romini in contempt, and then recited the ruling that this court reversed. And then the court said in light of these rulings, the court fines, blah, blah, blah. So the court expressly relied on Judge Hicks' contempt ruling. The contempt ruling was not based on law of the case, but rather the facilities restriction that was not litigated until the contempt appeal. In other words, that – the facilities restriction and database was not litigated in Romini 1. It was only litigated in the contempt appeal. And what was litigated in Romini 1 was the PeopleSoft. Is that correct? PeopleSoft, J.D. Edwards. You know, database was not litigated there because of the waiver issue, because of a waiver issue. There were two different people – or database licenses. This ruling is under one that was not litigated in Romini 1 liability. Your central point is database is at least the one thing that was pretty clearly not litigated in Romini 1. Correct. And was very clearly litigated in the contempt appeal, where this court very clearly held the database does not contain a facilities restriction, and therefore, this ruling can't stand. And before you get out of – run out of time, I'm sure you want some time for rebuttal. On the Langham app case, the one statement that I thought was closest was Oracle CPUs are unnecessary to be secure. To me, that does seem closer to the statement – that's statement 5. It says in my bench memo. Yes. Yes. I have the statements here, Your Honor. Okay. You know, I think the security statements, if you look at them as a whole, they're all effectively statements of opinion. I think we can all agree there are some variations in there. Right. On one end of the spectrum, there are things like Romini provides more security as compared to Oracle, which I just don't know how that could possibly be considered a statement of fact. I agree. The one the court mentions as to, you know, a challenge to Oracle's products, we would say this is what the marketplace is for. Oracle can respond to that. That is a statement of opinion regarding the necessariness – the necessity of Oracle's updates because that statement, of course, doesn't exist in isolation. It is in connection with the alternative updates being provided by Romini and so that the full context that the consumer would understand, the consumer for these Oracle's updates are not necessary for security if you use ours instead, not Oracle's are unnecessary in the abstract. And so it's drawing a comparison between unmeasurable quantities of which the security experts said reasonable. Would you address findings three and four under the Lanham Act? Three is that patching is inadequate. Four was that CPUs are of little value. So CPUs are of little value is essentially the same answer I just gave to Judge Bybee in comparison to the Romini. You know, Oracle CPUs are one-size-fits-all, you know, band-aids. Or Romini's are custom-built for the consumer, provide better protection. And I'm sorry, Judge Bybee, you asked me about one other and I blanked on it. Number three, the patching is inadequate. So there was considerable evidence at the trial that the model that Oracle uses, this is the band-aid approach that I just mentioned, is not really necessary for most customers and that a more customized solution is more useful for many customers, particularly those running outdated software, which is the majority of Romini's customers, right? These are people using many versions, old versions of Oracle software and a custom solution is better for them than the patching model that the industry had adopted for current software. And in that context, again, it's... I thought the district court issued some fairly extensive findings in this area, citing a number of the experts who had testified about the difference between what Oracle's patching and what Romini authorized with its customized fixes. It did seem that Romini could be a little more expeditious and wouldn't have to wait for an Oracle patch, but the experts did seem to be pretty clear that patching was sort of the industry standard. The industry standard, Your Honor, for current software, not for the support model that Romini provides, and again, the court jumped over the question of whether this was a statement of opinion to sort of having this battle of the experts and without having a quantifiable or verifiable, you know, numerical quantifiable claim, but instead this opinion-based approach. And again, I fully acknowledge there's a spectrum here. I think there is some are, you know, much farther on one end and some are close to the other. We think the security statements in whole, and they're artificially isolated in the injunction, right? This would be more complete, holistic, to coin a phrase. Statements in the marketing materials and so forth were in general understood to be this kind of comparison shopping for the benefit of consumers. Do you want to reserve some time for rebuttal? I would appreciate that, Your Honor. Thank you. Good afternoon, Your Honors. I'm Rachel Kummer, and I represent Oracle. Romini is a recidivist, contemptuous infringer. I would note that less than a year ago they stood here and told you that they had totally changed their processes. That isn't true. As a district court held, they have continued to engage in infringing conduct, making infringing derivative works and continuing their impermissible cross-use. The district court's well-reasoned and thorough bench order and permanent injunction should be enjoined. This conduct simply can't continue. Given the discussion that you were having earlier, I would like to start with Section 117. Their defense was appropriately stricken and well-briefed before it was stricken. It's not like the court just struck their 117A affirmative defense out of the blue. It's well-briefed in the record, and at no point in that record, in their briefing Romini didn't ask for factual development. They didn't even really discuss Verner or UMG at all. They forfeited the arguments they're making on appeal, and the district court's ruling was correct anyway. Oracle licenses its proprietary software. It obviously owns the copyright in PeopleSoft, but it also owns the copies. It just licenses those copies to its customers. Romini doesn't hold any such license. It doesn't hold any license to PeopleSoft. It could have tried to buy one from Oracle. It doesn't have one. It has to rely on the limitations in its customers' licenses, and under this court's established precedent in Verner, 117A wouldn't apply here because the PeopleSoft users are licensees. Our PeopleSoft licenses specify that the users are granted a license. They significantly restrict the user's ability to transfer the software, and they impose notable use restrictions. That is this court's well-established test, all of which is met here. I would ask the court to look at the city of Eugene's example. That license is in the record at 10 ER 2056. It clearly is a non-exclusive but non-transferable license to be used solely for the internal data processing operations at its facilities of the licensee holding that license. And right on the first page, it includes a long list of, quote, license exclusions. This is a written license. If our users aren't licensees, licensees must not exist. Like, this is a detailed, well-written license with significant exclusions. Section 117A just doesn't apply. So I know it was a little late in the game, the universal instruments. I was just looking at that case real quickly, and I don't know if you have an immediate response, but it seems to turn on that the licensee had a perpetual worldwide license to use, reproduce, and display the software for the licensee's internal use. Can you draw any distinctions based off of that? I would ask, Your Honor, if, since that case was never raised before, we'd be happy to submit supplemental briefing addressing it in precision. I would say that this Court itself acknowledged that there was no circuit split between Verner and the Second Circuit's test in Crousey, which has been briefed up here. In the Verner opinion itself, it found that this Court was in alignment with the Second Circuit's rule, and Verner is clearly applicable here. So I doubt that case is applicable, but on the merits, we would just ask to follow up on that, if that's all right. Yeah, that's sure. But I guess my basic question is, what restrictions and licensees would clearly defeat any incidence of ownership or any view of ownership in this case? So, first of all, Rimini doesn't even have a license. There's no chance that Rimini could be the owner. Rimini isn't even a licensee. That's true. So it would go down to our actual customer's licenses, and here, they just don't have incidence of ownership. They clearly say, this is a license. It is a nontransferable license. You can't assign it without our consent. You can't even disclose it to any employees or consultants unless they're under a nondisclosure obligation. Like, there are just significant limitations here. You can't even use it outside of the facilities, going back to the first case. Any incidence of ownership that might theoretically exist in some other case aren't here. I mean, this Court acknowledged in the Adobe case that there could potentially be a case where there was a purported license that actually affected a sale. That's what happened in UMG, but that's definitely not the case here. So, Your Honors, we would ask to speak to Rimini's many arguments regarding the derivative work standard. Really, in its briefings, that's where it was driving, and respectfully, those arguments are basically nonsense. So this Court, the district court correctly applied this Court's binding precedent in MicroSTAR when it held that Rimini's updates and tools for PeopleSoft substantially incorporate protected material from a preexisting work. MicroSTAR has been this Court's governing precedent on derivative works for two and a half decades, and it was appropriately applied here. It's also — Did not MicroSTAR indicate specifically that it has to exist in a concrete, permanent form of some sort? That's true. That's true, and Rimini doesn't contest that its updates exist in a concrete and permanent form. All the parties agree that they do, Your Honor. And that's also what the main part of the test under the Lewis and Globe test was. That test really is about concrete and permanent form, but it's inapposite here, because under MicroSTAR's test, it does need to be concrete and permanent, but Rimini's updates are concrete and permanent, as they agree. The real question on appeal, as raised by Rimini, is whether the derivative works at issue were able to substantially incorporate protected expression. Now, in its brief, Rimini has attempted to make this rule — basically, it's made up of two other rules that don't exist. First, it basically posits that it would have to incorporate the source code itself. That's not the law. And also, both Rimini and its amici have put a lot of argument and pressure on this idea of interoperability. Right. At no point in any order or opinion in the record in this case does the lower court even use the word interoperable or interoperability. That is not something that the district court held. But isn't it the obvious offshoot of that ruling? I was — no, Your Honor, it isn't. Okay. The difference is that the software at issue here, the PeopleSoft updates that Rimini extends PeopleSoft into simply are not actually interoperable. INTR with PeopleSoft, I would say they're intraoperable. They only work with and within PeopleSoft. They are extensions and modifications of PeopleSoft. They're created using PeopleSoft. So that's the distinction you're drawing, is that it's only interoperable with one program versus multiple programs? That is a key part of the MicroSTAR ruling. And footnote 5 of MicroSTAR, this Court held that one of the main reasons that the only work within Duke Nukem software. Similar right here. Yeah, because it's using Duke Nukem, like, IP, like, not, you know, the storyline and the plot and things of that nature, which is different than being interoperable with software. Right. So our point here is that they only exist within PeopleSoft. They don't actually stand alone. Like, how is that not different than the Game Genie case, where it only works with the — I think the Nintendo or I forget which one. So, first of all, in the Game Genie case, that case was the case that was about whether it was concrete and permanent, which is why, really, the focus of that case is inapposite here, since we — everyone agrees they're concrete and permanent. But in the Game Genie case, the Game Genie was not created with Nintendo software. It wasn't created with Nintendo tools. And it wasn't really — But it only works with the Nintendo system. It works within the Nintendo system as a whole, but not with any particular software. Ms. Comer, here, in terms of Nintendo and Game Genie and the like, in terms of the artistic expression, correct me if I'm wrong, the software in this case is, with respect to programs running, payrolls, reports, taxes, et cetera. Is that the nature of the software here? Yes, Your Honor, and frankly, I love — And if it is — and let me interrupt you — but if it is, it seems to be the very nature of this software, unlike areas of artistic expression, perhaps, with respect to video games, the nature of the software here necessarily, it seems to me, is subject almost to annual changes, be it tax regulations, tax opinions, or whatever, in terms of processing, to keep current with that. And I think there's a significant distinction, at least I've seen, if you can address that, because this is not video games building upon an earlier video game. These are software systems based upon, in many contexts, I guess, government regulations, is it not? They have to be current every year with government regulations. Your Honor, I really appreciate this question. So, the protected expression in PeopleSoft software is the story of HR and tax compliance, which, you know, like, it may not be a fantastical journey with, like, Knights and Dragons, like you might find in a video game — It may not sell as well, sure, that's true. It's not going to sell to teenagers, that's for sure. But it's still a journey, and it has obstacles and challenges that are overcome with PeopleSoft. That's what the PeopleSoft software does. It helps the navigation of the journey of tax and HR compliance. Counsel, I had understood when we were discussing the licenses that Rimini's customers were licensed to have third parties service the product, which is what Rimini does. How could Rimini possibly do that without making it specific to the programs that they're addressing, such as PeopleSoft? Oh, thank you, Your Honor. And if so, I don't understand Judge Hicks' comment that the work violates the — is derivative, even if the work does not contain any of the copyrighted code. I just don't — I don't see how that squares up with the cases. The Game Genie and MicroStars cases seem very, very different to me. So, I would take that. I think there are two aspects in response to your question, Your Honor, and thank you. First of all, there are two — there are sort of two separate issues. One is whether it's a derivative work, and the other is whether the derivative work is infringing. On appeal, the lead argument is that they aren't even derivative works. That's a separate issue from whether they are infringing. It is true that our customers hold licenses to — that allow them to have a third party modify their software to update it. They could try to do it themselves. And if they're within their own customer environment and making those modifications for their own internal data processing operations at their own facilities, that's license conduct. It's not infringing. And that — those would be derivative works, just not infringing ones. All of the derivative works, though, that are remedies updates — excuse me, remedies updates are all derivative works because they extend and modify PeopleSoft. They only work with PeopleSoft. They are created with PeopleSoft, and they're created using PeopleSoft tools. They are the sequels of our software. And under Section 106 of the Copyright Act, as the copyright holder, we have the right to create those sequels. We have the right to create those derivative works. And we have licensed that right to our customers, provided that they comply with the terms of those license. When remedy engages — Roberts. What was the distinction you're drawing between an infringing derivative work and a non-infringing derivative work? The infringing derivative work, Your Honor, would be one that is created in violation of the license terms. There's always going to be a derivative work created when you update the software because it moves into the next version of the software or the sequel to the software. We can create those derivative works, the next version of our own software, so can our customers. But it has nothing to do with the intraoperability, as you're saying then. That's exactly right. Whether it is intra or intraoperable doesn't go to whether it's infringing. That goes to whether it's a derivative work. Their lead argument here is that their updates aren't even derivative works. They're arguing that because they are — that they argue that — Well, I guess I don't understand. Your point is that they're allowed to do updates, and then Oracle just gets to decide whether or not it's infringing or not? What's the — what is the — I'm missing something. No, I'm sorry. My argument is, and our longstanding argument in alignment with this court's prior holdings, is that they are allowed to create derivative works in accordance with their customers' licenses, that the customers hold licenses for months. If they create derivative works or copies that violate those license terms, then those copies are infringing works. And that can be either because — Counsel, this feels entirely circular. I don't understand what they get to do here. If they can't touch the Microsoft program, because again, Judge Hicks said, even if the work does not contain any of the copyrighted code, how can they possibly address anything in PeopleSoft without infringing it? Of course it's going to be derivative. But your question is whether it's infringing. I don't understand how they could possibly update anything on PeopleSoft without it being infringing under your definitions. Because they can, as — so even here, Chief Judge Dew held below that certain of Rimini's updates weren't — are not infringing. If they create a manual update for one customer in one customer's environment, they're just doing the work for one customer in that customer's environment, that is in compliance with that customer, such that it is always in compliance with that customer's license. That creates a derivative work, but it's not an infringing derivative work. But that's not what Rimini's process does. Rimini's process 2.0 violates this Court's prior orders preventing impermissible cross-use. Because when they create copies, they're doing so in order to create a one-size-fits-all code file, in order to prototype and distribute impermissible copies. They go into customer A's environment, prototype an update, and then automatically ship it out to a bunch of other customers. So, Counsel, I understand the cross-use problem. It feels like there was a very large jump shift in your argument here. Because I don't understand, under the argument that you were making, why even a manual update for one customer would not be infringing under the principles that you set forth. Well, a manual update for one customer, as the District Court below recognized, isn't infringing as long as it's in compliance with their license agreements. Our customers are allowed to implement updates themselves if they wish, or they can engage a third-party support provider to provide those updates for them and implement them for them, as long as it's in compliance with the terms of the specific license at issue. So wouldn't that do — aren't you basically saying there's two separate arguments? One is whether or not it's a derivative. And that — so that shouldn't implicate the statute. And the question is, you know, the automated tools and all those other things, whether or not that violates the license. That's a different question. Yes, sir. That's exactly what I'm saying. Yeah. Okay. So — That's exactly what I'm saying. Because the question of what the derivative work seems to be, it seems muddled into that — there's two separate questions here, it seems. I think that — well, respectfully, I think the remedies briefing muddled those questions likely intentionally, because there is no holding from the District Court. The District Court didn't hold that our — that an update could be a derivative work, infringing or otherwise, just because it was interoperable with software. So I guess my question is, could we hold that the District Court was wrong on its rule — on its section 101 ruling on what's a derivative work, but still say it was — it did violate the license or to do the cross-use, the automated tools for cross-use? I think there are two separate questions. So I suppose that's theoretically possible, Your Honor. But here the District Court's ruling completely follows from Microsoft and appropriately applies to this MicroStar, but then completely appropriately follows this Court's precedent. Okay. Are there — do you have any other questions on derivative works, or should we hit any other aspect of the case? Go ahead. All right. I think it would be helpful to say that with respect to the database arguments that you had earlier today, that is largely and essentially an academic argument here, because we were not granted any relief on Oracle Database in the injunction. And additionally, the District Court's decision below didn't read a facilities restriction in for those 18 GAP customer environments. It was basically a forfeiture ruling. Right. She held that Remini didn't even address the creation of the 18 environments theory and that it was undisputed. So I would say that, you know, that's really the situation with Oracle Database. So do we not have to rule on it, or what are you saying that's largely — Yeah. Because I am confused whether or not it fits into the Oracle I or Oracle, you know, II. It follows from Oracle I. That's right. Because there are GAP customer environments, and it's the exact same conduct extended into the period following the close of fact discovery in Oracle I up until the time in 2014 when Remini claimed that it began its process 2.0. And they agree and have conceded that it's the same conduct throughout. So it would follow under those prior rulings which have been affirmed. Yeah, that's kind of my view, that it's a rule of the case under Oracle I. No. That's our view as well. Okay. Got it. And with respect to the Lanham Act, and I have, I think, only two minutes, so I'll hit it quickly. The district court's Lanham Act rulings are correct. The district court found that Remini made three different categories of false statements. They've only appealed one of those categories here. They have not appealed the district court's ruling that they made false statements that they were complying with this Court's Oracle I rulings or that they — and the rulings that they falsely stated they were complying with our — terms of our copyright. And they also haven't appealed the district court's ruling that they made false statements that there were differences between Remini and Mr. Raven's prior criminal enterprise Tarmara Now. So that's not on appeal. Those parts of the injunction should certainly be affirmed, as should the other aspects regarding the comparative security offerings. Remini's statements about — Essentially, items 3 through 15. Correct. Essentially. Okay. Or I have 3 through 14, but yes. Okay. So those rulings about comparative security are false and misleading. They are commercial statements that are literally false and, in fact, misled customers under the district court's extensive factual findings. So each of these findings is demonstrably false. The key reason is because Oracle's critical patch updates are, in fact, necessary, and virtual patching is not a sufficient exchange for it. The testimony doesn't refer to Oracle's CPUs as a Band-Aid. It refers to virtual patching as a bridge until you can get a patch update that actually fixes the underlying software. There is no way for Remini's security, as its own experts testified, to actually fix the software, because we have the code. The only way you can actually correct the underlying software is with a CPU fix. And it needs to be updated, because — and this is a world of hackers. We send out our CPU updates every three months. And one of the main problems — Let me pick a couple of the findings here that I have questions about. So let's take number six. It is not risky to switch to Remini. Why isn't that just plain old puffery? You have sophisticated clients. Remini is saying, look, we're not doing patches, but we can do other things, and you don't have any risk, and we're going to be Johnny-on-the-spot and attend you well. And that just feels like just chatter. Your Honors, it is a factually false statement. It is risky to switch to Oracle. And first of all, that is a fact — Risky by what? By what measure? It's risky because, for example, when we implement a critical patch update to the underlying source code, then a hacker is able, potentially, to reverse engineer from that patch to find out where the vulnerability was before. Now, Remini's customers can never, unless they come back to Oracle, which they're So, over time, unless you put in the source code patches, PeopleSoft gets riskier and riskier and riskier. And if you've switched to Remini, you can't get the source code fixes. How do you know that we're talking about risk about hackers? Couldn't it be risk about something else? Well, these statements are all about the security risk of the software, Your Honor. So it could be hackers. It could also be the inability to go by a firewall, based on the extensive findings of the district court below, that if firewalls are insufficient, you have to have the CPU fixes to make your software secure over time, which is why we're happy to provide and provide for free the most recent and fully updated versions of our software to our customers so that they can have that security, so that they can have the fixes. Now, the security patches, the virtual security patches that Remini offers are just repackaged from McAfee. Anyone can get a McAfee support. And McAfee's own company testified in the trial below that their virtual patch technology is just a bridge and that they recommend that their clients get the source code patches, like our CPU patches, and that when those become available, they're implemented. So, Your Honors, I see that I am out of time. I would say I thank you very much. The district court's opinion is correct, and its injunction should be affirmed. Thank you. Thank you, Counsel. Let's give him two minutes. Thank you, Your Honor. One point on 117A. Remini is not licensed, but the statute says that the owner of the copy may authorize the making of the copy. So it expressly authorizes third-party maintenance. On derivative works, five points quickly, if I may. First, in MicroStar, the sequel incorporated the story, which the court said at page 1112 of the opinion was the plot, the theme, the dialogue, the mood, the setting, the characters, and et cetera. Functional software about what tax rate applies in Oklahoma doesn't have themes, moods, or dialogues. There is no expressive activity here. Second, we put this point to Oracle's expert at trial. And this is the substantial incorporation standard, right? This is true in every circuit, including this Court. And the question, this is from ER 1123. Under your definition, Oracle's definition, a Remini file can be a derivative work of Oracle software even if it contains no literal or nonliteral Oracle expression whatsoever. Correct? Correct. And let's talk about what we're actually talking about here, Your Honor. The tools that Remini built, Remini has patents on these tools. These are Remini-only creations. It's own software that it wrote, that it went to the patent office and got patents on to do new work for its customers, that, yes, it works on PeopleSoft and many other programs, but that's the nature of maintenance. It can't be done, as Judge Bybee indicated earlier, without doing it. And that is not a derivative work. And if it were, it would threaten the entire software industry, as the amici make abundantly clear. Can I ask a question? So that Rule 101 derivative analysis is separate from whether or not the cross-use and automated tools is infringing in one way or another? Yes, Your Honor. That was actually my fourth point. Thank you. All of Oracle's arguments come back to cross-use, right, because these are not derivative works, period, full stop, right, other than the 15 rewrite files. So they come back to cross-use. Let's think about what that is in the context of this case. That's a harmless error argument, because Oracle sold this definition of derivative works at the summary judgment stage. We sought an interlocutory appeal. Judge Hicks acknowledged that it might be reversed on appeal. He knew he had gone too far, but he didn't authorize the appeal. So the whole case proceeded to trial through summary judgment, pretrial submissions, objections to evidence, Daubert approaches, objections at trial, objections post-trial, that Oracle doubled down and doubled down and doubled down on this derivative works definition, because after seven years of litigation and $70 million in legal fees, its expert never looked at the code. Not one of the thousands of files here has any Oracle code in it, has any Oracle expression in it, because they had this definition of interoperability, which is at ER 144. It says exactly that, Your Honor. And they didn't need it. So now they come to this Court and say, never mind, because we have a cross-use argument. Well, if that was their theory, they should have gone to trial on cross-use and adopted a proper theory of derivative works. Harmless error is the burden on the asserter to show that it would — that the outcome would not have changed. Derivative works infected, infested this case from start to finish. This was how Oracle chose to try the case. That was their choice, and they didn't prove it. And if you look at the injunction, it has ten paragraphs. Eight of them are based solely on derivative works or largely on derivative works. And even as to cross-use, if you look at paragraph 57, for example, which is at ER 160, Judge Due intermingled derivative works and cross-use. And so you can't separate it out, as Oracle says. This was tried as a derivative works case. They won it as a derivative works case, but on a definition that is wrong, wrong, wrong as a matter of law. And this harmless error based on cross-use just doesn't work. We also challenged the cross-use, but that's in the briefs. Right. Okay. Any other questions for my colleagues? If you want to wrap up your two minutes over. You going to give me two more minutes? Oh, no, no. I don't think so. I mean, I would love it, but I would thank the court for his time, and we appreciate everyone's attention. Thank you. Thank you, counsel. This case is submitted. Thank you both for an excellent argument.
judges: BYBEE, BUMATAY, Bennett